REPUBLICAN NATIONAL COMMITTEE et al., Plaintiffs,

v.

FEDERAL ELECTION COMMISSION et al., Defendants.

No. 78 Civ. 2783.

United States District Court,
S. D. New York.

Feb. 5, 1980.

Judgment Affirmed April 14, 1980.
See 100 S.Ct. 1639.

See also D.C., 461 F.Supp. 570, 2nd Cir., 615 F.2d 1.

Lord, Day & Lord, New York City, for plaintiffs; John W. Castles, 3d, Ralph K. Winter, James M. Morrissey, New York City, of counsel.

William C. Oldaker, Charles N. Steele, Carolyn U. Oliphant, Susan E. Propper, Washington, D. C., for Federal Election Commission.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants Bell and Blumenthal; Patrick H. Barth, Asst. U. S. Atty., New York City, of counsel.

Ostrolenk, Faber, Gerb & Soffen, Edward A. Meilman, New York City and Wilmer, Cutler & Pickering, Lloyd N. Cutler, Roger M. Witten, Alan B. Sternstein, Washington, D. C., for amici curiae Common Cause, David Cohen and Nan Waterman; Kenneth J. Guido, Jr., Ellen G. Block, Washington, D. C., of counsel.

Before MANSFIELD and VAN GRAAF-EILAND, Circuit Judges, and GAGLIAR-DI, District Judge.

## OPINION

MANSFIELD, Circuit Judge:

In this action for declaratory and injunctive relief against enforcement of certain provisions of the Presidential Election Campaign Fund Act, Ch. 95 of Subtitle H of the Internal Revenue Code of 1954, 26 U.S.C. §§ 9001, *et seq.* ("Fund Act") and the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431, *et seq.* ("FECA"), we have, by order entered pursuant to 28 U.S.C. § 2284 on November 30, 1978, been convened as a three-judge court in accordance with § 801(b) of the Fund Act, 26 U.S.C. § 9011(b), which expressly grants jurisdiction to such a court to "implement or construe" any provision of the Fund Act.

On February 20, 1979, defendants renewed their motion to dismiss the action after a prior motion before the single-judge district court (Gagliardi, J.) had been denied without prejudice pending the convening of a three-judge court and certification of related issues regarding the constitutionality of FECA by it to the Court of Appeals pursuant to 2 U.S.C. § 437h. See *Republican National Committee v. Federal Election Commission*, 461 F.Supp. 570, 575–76 (S.D. N.Y.1978). On October 15, 1979, after hearing the parties and accepting submissions of evidence we and the single-judge district court filed "Joint Findings of Fact" (attached hereto as Appendix A).

Plaintiffs' basic contention before this three-judge court is that certain provisions of the Fund Act violate the constitutional rights of a major-party presidential candidate and his supporters. After review of the evidence in the light of applicable law we are satisfied that these claims must be dismissed.

The "Joint Findings of Fact," which set forth the nature of this action, the statutory provisions under attack, a summary of plaintiffs' claims and the facts as found by the single-judge district court and this court, need not be repeated here. Suffice it to say that the principal provisions of the Fund Act under attack as unconstitutional are those in 26 U.S.C. § 9003(b),[1] which specifies that a presidential candidate, in order to be eligible for payments out of the "Presidential Election Campaign Fund," 26 U.S.C. § 9006, must certify that he or she (1) will not incur expenses in excess of the aggregate to which the candidate is entitled from the Fund under 26 U.S.C. § 9004[2] and

1. Title 26 U.S.C. § 9003(b) provides:

"(b) *Major parties.*—In order to be eligible to receive any payments under section 9006, the candidates of a major party in a presidential election shall certify to the Commission, under penalty of perjury, that—

(1) such candidates and their authorized committees will not incur qualified campaign expenses in excess of the aggregate payments to which they will be entitled under section 9004, and

(2) no contributions to defray qualified campaign expenses have been or will be accepted by such candidates or any of their authorized committees except to the extent necessary to make up any deficiency in payments received out of the fund on account of the application of section 9006(d), and no contributions to defray expenses which would be qualified campaign expenses but for subparagraph (C) of section 9002(11) have been or will be accepted by such candidates or any of their authorized committees. Such certification shall be made within such time prior to the day of the presidential election as the Commission shall prescribe by rules or regulations."

2. Title 26 U.S.C. § 9004 provides in pertinent part:

"§ 9004. *Entitlement of eligible candidates to payments*

(a) *In general.*—Subject to the provisions of this chapter—

(1) The eligible candidates of each major party in a presidential election shall be entitled to equal payments under section 9006 in an amount which, in the aggregate, shall not exceed the expenditure limitations applicable to such candidates under section 320(b)(1)(B) of the Federal Election Campaign Act of 1971."

Title 26 U.S.C. § 9006 provides in pertinent part:

"§ 9006. *Payments to eligible candidates*

(a) *Establishment of campaign fund.*— There is hereby established on the books of the Treasury of the United States a special fund to be known as the 'Presidential Election Campaign Fund'. The Secretary of the Treasury shall, from time to time, transfer to the fund an amount not in excess of the sum of the amounts designated (subsequent to the previous Presidential election) to the fund by individuals under section 6096. There is appropriated to the fund for each fiscal year,

2 U.S.C. § 441a(b)(1)(B)[3] and (2) that he will not accept private contributions except to the extent necessary to make up any deficiency in the Fund. Section 9004 prohibits the candidate from receiving payments from the Fund in excess of the amount specified by FECA, 2 U.S.C. § 441a(b)(1)(B), which, in the case of a "major-party" candidate (i. e., one whose party received at least 25% of the popular vote cast in the last presidential election, 26 U.S.C. § 9002(6)) is $20,000,000 as adjusted for changes in the consumer price index.[4]

■ The grant of jurisdiction by § 801(b) of the Fund Act, 26 U.S.C. § 9011(b) to this court to "implement or construe" any provision of that Act would appear to require us initially to construe its constitutionality, whereas circuit courts are granted jurisdiction by 2 U.S.C. § 437h(a) to "construe the constitutionality of any provision" of FECA. Plaintiffs have standing to raise the issue, since they, as committees and voters, may be precluded by the legislation from raising or contributing private funds toward the election of a Republican presidential candidate in 1980 if the candidate opts in favor of accepting payments out of the public Fund. 26 U.S.C. § 9011(b)(1). Cf. *Buckley v. Valeo,* 424 U.S. 1, 11–12, 96 S.Ct. 612, 630–31, 46 L.Ed.2d 659 (1976).

*First and Second Causes of Action*

Plaintiffs' First Cause of Action claims that the foregoing statutory provisions violate their First Amendment rights by conditioning eligibility for public campaign funds upon compliance with expenditure limitations. Their Second Cause of Action alleges that the First Amendment is also violated because the Republican presidential candidate in 1980 will be forced, because of "legal and practical factors" to opt in favor of public funding. What plaintiffs seek is the right to solicit, receive and spend both public and private campaign funds, without any limitations, even though the alternative of public financing made available by Congress to candidates was clearly "intended as a *substitute* for private contributions," *Buckley v. Valeo, supra,* 424 U.S. at 99, 96 S.Ct. at 673. (Emphasis added).

Fundamental to both causes of action is the contention that a presidential candidate is somehow or other forced as a practical matter to accept public funding in lieu of unlimited private funding and spending, and that this deprives the candidate and supporters of their First Amendment rights. Neither the statutes under attack nor the evidence adduced by plaintiffs supports this contention.

Each candidate remains free under the Fund Act, instead of opting for public funding, to attempt through private funding to

out of amounts in the general fund of the Treasury not otherwise appropriated, an amount equal to the amounts so designated during each fiscal year, which shall remain available to the fund without fiscal year limitation.

(b) *Payments from the fund.*—Upon receipt of a certification from the Commission under section 9005 for payment to the eligible candidates of a political party, the Secretary of the Treasury shall pay to such candidates out of the fund the amount certified by the Commission. Amounts paid to any such candidates shall be under the control of such candidates."

3. Title 2 U.S.C. § 441a(b)(1)(B) provides:

"(b)(1) No candidate for the office of President of the United States who is eligible under section 9003 of Title 26 (relating to condition for eligibility for payments) or under section 9033 of Title 26 (relating to eligibility for payments) to receive payments from the

Secretary of the Treasury may make expenditures in excess of—

\* \* \* \* \* \*

(B) $20,000,000 in the case of a campaign for election to such office."

4. Title 2 U.S.C. § 441a(c)(1) provides:

"(c)(1) At the beginning of each calendar year (commencing in 1976), as there become available necessary data from the Bureau of Labor Statistics of the Department of Labor, the Secretary of Labor shall certify to the Commission and publish in the Federal Register the percent difference between the price index for the 12 months preceding the beginning of such calendar year and the price index for the base period. Each limitation established by subsection (b) of this section and subsection (d) of this section shall be increased by such percent difference. Each amount so increased shall be the amount in effect for such calendar year."

raise more than the "$20,000,000 plus" public funding limit and to spend any amount of funds raised by private funding, without any ceiling. Indeed, major-party presidential candidates have succeeded in doing so prior to Congress' enactment of the legislation here in issue. For instance, in 1972 candidates Nixon and McGovern raised $60.2 million and $38.7 million, respectively, through private financing.[5] "Plainly, campaigns can be successfully carried out by means other than public financing; they have been up to this date, *and this avenue is still open to all candidates.*" *Buckley v. Valeo, supra,* 424 U.S. at 101, 96 S.Ct. at 674 (Emphasis added).

In view of our finding that a presidential candidate is not compelled to accept public financing under the statutes or to accept the limitations imposed by 26 U.S.C. § 9003, we are left with the issue of whether Congress may lawfully condition a presidential candidate's eligibility for public federal campaign funds upon the candidate's voluntary acceptance of limitations on campaign expenditures and private contributions. This question in turn raises three others: Does Congress have the power to enact such a provision, and, if so, is the effect of the law to abridge either (a) the rights of the candidate or (b) the rights of his or her supporters.

We have no difficulty concluding that the imposition of such conditions lies within Congress' power to legislate under the General Welfare Clause and that, as long as the candidate remains free to engage in unlimited private funding and spending instead of limited public funding, the law does not violate the First Amendment rights of the candidate or supporters.

Congress' power to enact the very statutes here under attack was recognized by

the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 57 n. 65, 96 S.Ct. 612, 653, n. 65, 46 L.Ed.2d 659 (1976), where the Court stated:

> "Congress may engage in public financing of election campaigns and *may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations.* Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding." [6] (Emphasis added).

The legislative history of the public financing provision gives evidence of two Congressional concerns: to give candidates the opportunity to lessen the "great drain on [their] time and energies" required by fundraising "at the expense of providing competitive debate of the issues for the electorate" and to "eliminate reliance on large private contributions" and on the implicit obligations to private contributors that may arise from such reliance without decreasing the ability of the candidates to get their message to the people. Senate Report No. 93–689, at pp. 5–6, reprinted in [1974] U.S. Code Cong. & Admin.News, pp. 5587, 5591–92. If the candidate chooses to accept public financing he or she is beholden unto no person and, if elected, should feel no post-election obligation toward any contributor of the type that might have existed as a result of a privately financed campaign.

While Congress may not condition benefit on the sacrifice of protected rights, see *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Frost & Frost Trucking Co. v. Railroad Commission,* 271 U.S. 583, 593–94, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926), the fact that a statute requires an individual to choose between two methods

---

5. It may be suggested that the ability of Nixon and McGovern to raise over $20 million is irrelevant because they were permitted to accept contributions over $1,000, while more recent amendments to FECA prohibit such contributions. 2 U.S.C. § 411a(a)(1)(A). However, plaintiffs have made no showing as to how much of the Nixon and McGovern totals consisted of contributions over $1,000.

6. The plaintiffs argue that this passage is mere dictum. We do not agree. It was because of the expenditure limitations that the Court upheld the campaign fund against the constitutional challenge of minor parties.

of exercising the same constitutional right does not render the law invalid, provided the statute does not diminish a protected right or, where there is such a diminution, the burden is justified by a compelling state interest. *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). "[N]ot every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid." *Corbitt v. New Jersey*, 439 U.S. 212, 218, 99 S.Ct. 492, 497 (1978). See also *Wyman v. James*, 400 U.S. 309, 317–18, 91 S.Ct. 381, 385–86, 27 L.Ed.2d 408. Where compelling governmental interests exist, Congress' power to place reasonable conditions upon expenditures of public funds, even where they affect exercise of First Amendment rights, has been recognized. See, e. g., *Oklahoma v. Civil Service Commission*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947) (upholding constitutionality of U.S. Civil Service Commission order under Hatch Act, 53 Stat. 1147, requiring removal from office of federally financed state employees engaged in state politics).

Here the conditions imposed by Congress upon receipt of public campaign financing do not infringe upon the First Amendment rights of candidates. But even if they were so viewed, the burden attributable to the limits imposed by the legislation is fully justified by the compelling state interests described above.

The Fund Act merely provides a presidential candidate with an *additional* funding alternative which he or she would not otherwise have and does not deprive the candidate of other methods of funding which may be thought to provide greater or more effective exercise of rights of communication or association than would public funding. Since the candidate remains free to choose between funding alternatives, he or she will opt for public funding only if, in the candidate's view, it will *enhance* the candidate's powers of communication and association. As the Court stated in *Buckley v. Valeo, supra,* 424 U.S. at 92–93, 96 S.Ct. at 670:

"Subtitle H is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process  .  .  .  . . Subtitle H furthers, not abridges, pertinent First Amendment values."

Plaintiffs contend they must as a practical matter accept public funding because without it they would raise less money privately and thus have less power to communicate, and at the same time they urge that the effect of public funding is to inhibit the exercise of their First Amendment right to communicate. Even if we accepted their claim that they are in practice compelled to opt for public funding, its effect would be to facilitate and enlarge their exercise of free speech over what it would otherwise be rather than to inhibit or reduce their speaking power. Hence the limitations imposed by § 9003(b) cannot violate the First Amendment rights of the candidate.

Moreover, even if there were some burden on the First Amendment rights of the candidate, the statutory scheme is supported by a compelling state interest. The goals of Congress—"to reduce the deleterious influence of large contributions on our political process, to facilitate communication by candidates with the electorate, and to free candidates from the rigors of fundraising," *Buckley v. Valeo, supra,* 424 U.S. at 91, 96 S.Ct. at 669—represent significant state interests, *id.* at 95–96, 96 S.Ct. at 671. The public interest purposes behind the decision of Congress to provide for the financing of presidential elections would hardly be served unless some reasonable limits and conditions were imposed. If a candidate were permitted, in addition to receipt of public funds, to raise and expend unlimited private funds, the purpose of public financing would be defeated. Although the total amount raised and spent by each candidate, and hence the candidate's speech power, would be increased by the sums contributed from the public coffers, the candidates would no longer be relieved of the burdens of soliciting private contributions and of avoiding unhealthy obligations to private contributors. Thus the conditions placed on

the expenditure of public funds are necessary to the effectiveness of a program which furthers significant state interests.

We similarly conclude that the limitations imposed by § 9003 do not abridge the rights of supporters. The plaintiffs have shown that the effect of the public funding alternative is to decrease the importance of "grass roots" political activity compared to privately financed campaigns. Private individuals are unable to make expenditures coordinated with the campaign organizations, such as renting vans to distribute literature, paying the cost of photocopying and distributing campaign materials received from the candidate's organization, and expressing support by contributing money to the campaign. On the other hand, supporters are left with a wide range of ways to express their support. Certain activities in coordination with the campaign are excluded from the definitions of "contribution" and "expenditure," see 2 U.S.C. § 431(8)(B), 9(B); supporters may contribute their time and effort. Most important, uncoordinated expenditures are permitted without limit. Limitations on uncoordinated expenditures were held unconstitutional in *Buckley v. Valeo, supra,* 424 U.S. at 39–51, 96 S.Ct. at 645–650.

We note first that since the candidate has a legitimate choice whether to accept public funding and forego private contributions, the supporters may not complain that the government has deprived them of the right to contribute. There is nothing improper or unusual in · recognizing that a candidate rather than his or her supporters should control the method of financing the campaign. In this respect the statute simply reflects the basic right of any person to accept or reject campaign contributions from any other person or committee, or not to run for office at all. As in *Marchioro v. Chaney,* 442 U.S. 191, 99 S.Ct. 2243, 2248, 60 L.Ed.2d 816 (1979), the complaint of the contributors should be addressed to the candidate who has chosen to forego private financing, rather than to the courts. Cf. *Rowan v. Post Office Dept.,* 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970) ("no one has a right to press even

'good' ideas on an unwilling recipient"). Moreover, it may reasonably be anticipated that in making such a decision, including whether or not to accept public financing with its statutory conditions, the candidate will ordinarily first consult representatives of his principal supporters. In short, it would be unreasonable to preclude a candidate who prefers public financing from using it instead of private financing merely because some supporters believe that the decision deprives them of the ability to contribute to the candidate's election in the precise way they would if the campaign were privately financed.

Even if the restrictions on coordinated contributions and expenditures were seen as a restriction imposed by the government on the contributor's ability to communicate freely, those restrictions, limited as they are, could still be upheld. The "free speech" component of a contribution lies in the "symbolic expression of support" it evidences. *Buckley v. Valeo, supra,* 424 U.S. at 20–21, 96 S.Ct. at 631. The Supreme Court in *Buckley* upheld the $1,000 contribution limitation in part because it left individuals "free to engage in independent political expression" and to·express support by volunteering their services. 424 U.S. at 28, 96 S.Ct. at 639. Cf. *Kovacs v. Cooper,* 336 U.S. 77, 88–89, 69 S.Ct. 448, 454, 93. L.Ed. 513 (1949) (upholding ordinance regulating use of sound trucks when "[t]here is no restriction upon the communication of ideas or discussion of issues by the human voice, by newspapers, by pamphlets, by dodgers"). The public interest in enacting a public funding program and in limiting coordinated contributions in order to effectuate that program is a considerable one. These limitations "do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties." 424 U.S. at 29, 96 S.Ct. at 639–640. The statute is "within the constitutional power of the Government"; it "furthers an important or substantial governmental interest"; that interest is

"unrelated to the suppression of free expression"; and "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Accordingly, we conclude that § 9003 does not violate the First Amendment rights of the plaintiffs.

### Third Cause of Action

Plaintiffs' Third Cause of Action is that the statutory public financing limitations operate in a way that discriminates in favor of an incumbent candidate to the disadvantage of a challenger and thus violates the First Amendment and the Due Process Clause of the Fifth Amendment. It is claimed that incumbent Presidents can, with less campaign expenditures and through exercise of their official powers and use of public facilities, command more national attention than can challengers, who do not have such free facilities available and must spend money to gain the public's eyes and ears. As a result, plaintiffs argue, the statutory limit on the amount of campaign expenditures that may be made by a challenger who accepts public funding gives him or her less public exposure than that gained by the incumbent.

If, as the Court assumes in *Buckley v. Valeo*, "an incumbent usually begins the race with significant advantages," 424 U.S. at 31 n. 33, 96 S.Ct. at 640 n. 33, and "the Government makes available other material resources to incumbents," *id.* at 33 n. 38, 96 S.Ct. at 641 n. 38, leading to the possible conclusion that "the limitations may have a significant effect on particular challengers or incumbents," *id.* at 33, 96 S.Ct. at 641, there is no indication that inequalities would be less under private financing. Indeed, regardless of whether a campaign is publicly or privately funded, it is inevitable that some candidates will have advantages over others. To require that public funding equalize these differences would distort its purpose, which is to facilitate political communication by providing an alternative to private funding with its burdens and un-

healthy influences. See *Buckley v. Valeo, supra,* 424 U.S. at 91, 96 S.Ct. at 669. It would not only be contrary to the American democratic political process, which is founded upon a public choice between parties and candidates of varying strengths, some facing greater odds and burdens than others, see *American Party v. White,* 415 U.S. 767, 787–88, 94 S.Ct. 1296, 1309, 39 L.Ed.2d 744 (1974), but would represent a departure from fundamental concepts of equal treatment. As the Court stated in *Buckley v. Valeo, supra:*

> "[I]t is important at the outset to note that the Act applies the same limitations on contributions to all candidates regardless of their present occupations, ideological views, or party affiliations. Absent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions. Cf. *James v. Valtierra,* 402 U.S. 137 [, 91 S.Ct. 1331, 28 L.Ed.2d 678] (1971)." 424 U.S. at 31, 96 S.Ct. at 640–641.

As long as it has a legitimate public purpose a public campaign funding law should not be required to remedy pre-existing inequalities between candidates, cf. *Ross v. Moffitt,* 417 U.S. 600, 611, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), any more than the "equal time" requirement of the 1934 Communications Act, 47 U.S.C. § 315, should be altered to remedy disparities between parties or candidates using public media. The statutes here under attack have a lawful purpose. They are neutral on their face and in operation. Accordingly we must conclude that the Fund Act does not unlawfully discriminate in favor of incumbent candidates against challengers or deny equal protection to presidential candidates.

### Fourth Cause of Action

Plaintiffs' Fourth Cause of Action alleges that the Fund Act and FECA, by reason of the campaign expenditure limitation imposed as a condition on public funding, dis-

criminate against candidates not politically allied with a substantial number of labor organizations, and thus violate both the First Amendment and the Due Process Clause of the Fifth Amendment. It is claimed that FECA and the Fund Act allow unions to raise and spend unlimited amounts of money on "a variety of partisan political activities which can be an integral part of a presidential candidate's campaign"; that this gives a substantial advantage to candidates with labor organizational support; that it is likely that in 1980 the Democratic presidential candidate will have support from more labor organizations than the Republican candidate; that FECA, 2 U.S.C. § 441b,[7] permits labor organizations to spend unlimited amounts, financed out of the union treasury, on communications with members which are designed to influence the presidential election, including "campaign material prepared or suggested by a candidate for President," and that corporations and other groups entitled under 2 U.S.C. § 441b to spend money for partisan activities are unable for practical reasons to do so as effectively as labor organizations.

Under 2 U.S.C. § 441b(b)(2) a labor organization's communication with its members and their families on any subject and its non-partisan voter registration and "get out the vote" drives aimed at union members and their families are exempt from the statutory definition of "contribution" and "expenditure." However, the same statute permits corporations to engage in the same communication with their stockholders, executive and administrative personnel and their families.

The provisions of the Fund Act and FECA prohibiting certain activities and permitting others on the part of labor unions and corporations are even-handed and entirely neutral on their face. Both corporations and labor organizations are prohibited by 2 U.S.C. § 441b(a) from making any contribution or expenditure in connection with a presidential election. (See footnote 7, *supra*). Moreover, as plaintiffs themselves concede, any expenditure made in "coordination" with a candidate's campaign must be treated as a "contribution" to the candidate under 2 U.S.C. § 441a(a)(7)[8] and

---

**7.** Title 2 U.S.C. § 441b provides in pertinent part:

"§ 441b. *Contributions or expenditures by national banks, corporations, or labor organizations*

(a) It is unlawful for . . . any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors . . . are to be voted for . . . .

\*　\*　\*　\*　\*　\*

(2) For purposes of this section . . . the term 'contribution or expenditure' shall . . . not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor or-

ganization, membership organization, cooperative, or corporation without capital stock."

**8.** Title 2 U.S.C. § 441a(a)(7) provides:

"(7) For purposes of this subsection—
(A) contributions to a named candidate made to any political committee authorized by such candidate to accept contributions on his behalf shall be considered to be contributions made to such candidate;
(B)(i) expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such a candidate;
(ii) the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered to be an expenditure for purposes of this paragraph; and
(C) contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice Presi-

would be illegal in the case of a candidate who opted for public funding under the Fund Act.

■ Thus, to the extent that plaintiffs allege that unions spend money on political activities forming an integral part of a president's campaign (Compl. ¶ 57) or which "can be fully coordinated with and integrated into the activities of the principal campaign committee of a presidential candidate" (Compl. ¶ 64), their attack is not upon the constitutionality of the Fund Act or on FECA but upon alleged non-enforcement of the provisions of these statutes, which is not an issue to be resolved by a three-judge court. To the extent that plaintiffs base their claim of unconstitutionality of the statutes upon the practical advantages of union support, such advantages can hardly be attributed to the statutes' public financing provisions, which make an equal amount of money available to each major-party presidential candidate. The same advantage, if any, would exist under private financing, which each candidate is free to choose in lieu of public financing. Lastly, the evidence adduced by plaintiffs fails to show that presidential candidates supported by labor organizations have enjoyed any substantial advantage over opponents; that labor unions would necessarily support the Democratic presidential candidate or that, if they did so, any advantage would not be offset by corporate support for the Republican candidate. In short, the statutory provisions are neutral on their face and the claim of discrimination in favor of candidates having labor union support, being based on speculation rather than facts, must be dismissed for failure to demonstrate any denial of free speech or equal protection to presidential candidates and their supporters.

### Fifth Cause of Action

■ Plaintiffs' Fifth Cause of Action, which alleges that the Fund Act and FECA

dent of the United States shall be considered to be contributions made to or for the benefit

violate the First and Fifth Amendments because the statutes are overbroad, must also be rejected. As we have shown, the public funding provisions of these statutes violate neither the First nor the Fifth Amendments. Public funding, as the Supreme Court noted in Buckley, supra, "furthers, not abridges, pertinent First Amendment values." 424 U.S. at 93, 96 S.Ct. at 670. It offers the presidential candidate an alternative that may enhance his or her First Amendment powers of communication, "free[s the] candidates from the rigors of fundraising," 424 U.S. 91, 96 S.Ct. 669, and eliminates the "danger of corruption," id. at 33, 96 S.Ct. at 641, without barring a candidate from deciding to adhere to private rather than public financing. Thus there is no basis for suggesting that the statute's "sweep [is] unnecessarily broad," NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1964), or that it exceeds what is "plainly legitimate," Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973).

### Sixth Cause of Action

■ Plaintiffs' Sixth Cause of Action—that the Fund Act and FECA deprive plaintiffs of Ninth Amendment rights—must likewise be dismissed in light of Supreme Court decisions recognizing Congress' power to regulate presidential elections, see, e. g., Burroughs v. United States, 290 U.S. 534, 547–48, 54 S.Ct. 287, 290–91, 78 L.Ed. 484 (1934), including the power to do so through the very legislation here attacked. Buckley v. Valeo, supra, 424 U.S. at 90, 96 S.Ct. at 668.

### CONCLUSION

For the foregoing reasons the complaint is dismissed insofar as it seeks to state any claim based on the alleged unconstitutionality of the Fund Act.

of the candidate of such party for election to the office of President of the United States."

# 290

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -x

REPUBLICAN NATIONAL COMMITTEE,
et al.,                                   :            78 Civ. 2783

                     Plaintiffs,    :        JOINT FINDINGS
          – against –                     :           OF FACT

FEDERAL ELECTION COMMISSION,       :

                     Defendants.    :

- - - - - - - - - - - - - - - - - - - - - -x

Joint Findings of Fact of the District Court Pursuant to the Federal Election Campaign Act of 1971, as Amended, 2 U.S.C. § 431, et seq., and of the Three-Judge Statutory Court Convened Pursuant to the Presidential Election Campaign Fund Act, Ch. 95, Subtitle H of the Internal Revenue Code of 1954, 26 U.S.C. §§ 9001, et seq.

GAGLIARDI, District Judge.

This is an action for declaratory and injunctive relief against the enforcement of certain provisions of the Presidential Election Campaign Fund Act, Chapter 95 of Subtitle H of the Internal Revenue Code of 1954, 26 U.S.C. §§ 9001 et seq. ("Fund Act") and the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431 et seq. ("FECA"). Plaintiffs, Republican National Committee ("RNC"), The Ripon Society of New York, Inc., Paul A. Cardamone and John A. Schmid, challenge the constitutionality of both of these federal election laws on First, Fifth and Ninth Amendment grounds. The defendants are the Federal Election Commission ("FEC") and its members, the Attorney-General, and the Secretary of the Treasury.[1] Jurisdiction is asserted under 28 U.S.C. §§ 1331, 2201 and 2202, § 314(a) of FECA, 2 U.S.C. § 437h(a), and § 801(b) of the Fund Act, 26 U.S.C. § 9011(b).

Section 801(b) of the Fund Act, 26 U.S.C. § 9011(b), authorizes the national committee of any political party and any individual eligible to vote for President to institute such actions for declaratory judgment and injunctive relief as may be appropriate to "implement or construe" any provision of the Fund Act, and further provides that such a proceeding, over which the district court is expressly granted jurisdiction, shall be heard and determined by a three-judge district court pursuant to 28 U.S.C. § 2284.[2]

---

1. Common Cause, a public interest organization, and two of its officers have been granted leave to participate as amici curiae.

2. 26 U.S.C. § 9011(b) provides:
   (b) Suits to implement chapter.—
   (1) The Commission, the national committee of any political party, and individuals eligible to vote for President are authorized to institute such actions, including actions for declaratory judgment or injunctive relief, as may be appropriate to implement or construe any provision of this chapter.
   (2) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subsection and shall exercise the same without regard to whether a person asserting rights under provisions of this subsection shall have exhausted any administrative or other remedies that may be provided at law. Such proceedings shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28, United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to sign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.

Section 314(a) of FECA, 2 U.S.C. § 437h(a), similarly authorizes a national committee and any individual eligible to vote for President to bring an action in the district court for a declaratory judgment "to construe the constitutionality of any provision of the Act" and mandates the single-judge district court immediately to certify "all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." [3]

Due to the aforementioned statutory scheme, the province of the three-judge court is limited to passing on issues related to the implementation and construction of provisions of the Fund Act while the province of the single judge is limited to certifying questions of constitutionality of FECA and taking whatever steps are necessary to effectuate such certification.

On November 30, 1978, this court, functioning as a single-judge court (Gagliardi, J.), noted the procedural ambiguities raised by the special review provisions of these two statutes and declined to decide the defendants' motion to dismiss at that time. The single-judge court, however, (1) granted plaintiffs' motion to convene a three-judge court pursuant to Subtitle H, 26 U.S.C. § 9011(b), to decide the constitutional issues raised with respect to certain provisions of the Fund Act and (2) stated that the single-judge court would entertain a motion to certify questions regarding the constitutionality of FECA to the en banc Court of Appeals pursuant to 2 U.S.C. § 437h. 461 F.Supp. 570 (1978).

Defendants thereupon renewed their motion to dismiss the complaint before the three-judge court. At the oral argument of this motion on May 8, 1979, the single-judge and three-judge court both recognized that the constitutional issues asserted with respect to both statutes (the Fund Act and FECA) were similar, and that plaintiffs directed most of their claims against provisions of the Fund Act which impose certain conditions on eligibility for public funding. *See* 26 U.S.C. § 9003. In an effort to comply with the mandates of both statutes, requiring decisions on constitutional issues be expedited, both district courts directed the parties to submit their evidence, proposed findings of fact and questions regarding the constitutionality of both Acts,[4] so that both courts simultaneously could make findings of fact with a view towards a simultaneous decision by the Court of Appeals and the three-judge district court of the constitutional issues. This procedure followed that which was adopted in *Buckley v. Valeo*, 171 U.S.App.D.C. 172, 519 F.2d 821 (D.C.Cir.1975), *aff'd in part and rev'd in part*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the only variation being that the district courts would make their findings before, rather than after, a remand by the Court of Appeals.[5]

I. *The Challenged Statutes*

The statutory scheme challenged by the plaintiffs is found in both the Fund Act, 26 U.S.C. §§ 9001–13 and the FECA, 2 U.S.C. §§ 431–55. The Fund Act, 26 U.S.C. § 9006, creates an optional public funding plan for presidential general election campaigns. 26 U.S.C. § 9004 provides that each eligible

---

**3.** 2 U.S.C. § 437h(a) provides:

(a) The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

**4.** No live testimony has been offered. The record consists of deposition transcripts and documentary evidence submitted by both sides.

**5.** As detailed at length in the single-judge court's decision of November 30, 1978, the District of Columbia Circuit has evolved a procedure in cases involving the constitutionality of both the FECA and the Fund Act whereby a single judge makes findings of fact and certifies constitutional issues pursuant to the FECA and the three-judge court and *en banc* Court of Appeals sit concurrently to decide questions of constitutionality of the Fund Act and the FECA respectively.

major party presidential candidate [6] may at his option receive an amount not exceeding the campaign expenditure limitations set forth in the FECA, i. e., $20 million as adjusted for increases in the cost of living. 2 U.S.C. § 441a(b)(1)(B), (c). To be eligible to receive payments from the "Presidential Election Campaign Fund",[7] however, § 9003(b) requires the major party presidential candidate to certify that he will not incur campaign expenses in excess of the FECA limitations and that he has not and will not accept any private contributions.[8] The FECA defines "contributions" to include "coordinated" or "nonindependent" expenditures, e. g., "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committee, or their agents." 2 U.S.C. § 441a(a)(7)(B). Thus, when a candidate accepts public funding, he must generally forsake private funding. With the exception of small amounts spent hosting social affairs in one's home or travelling while volunteering personal services to the candidate, 2 U.S.C. § 431(f)(4)(D), (E), individuals who support a publicly funded candidate are barred from contributing to his campaign or from making expenditures in cooperation with the campaign.[9] The statutes, however, do not prohibit supporters from making independent expenditures without consultation with the campaign, 2 U.S.C. § 441a(a)(7)(B), or from volunteering their services to the campaign without compensation. *Id.* § 431(e)(5)(A).

If a major party candidate rejects public funding, he is permitted, of course, to raise as much money as he can and spend all he can raise from private sources. The FECA, however, limits the size of contributions that a person may make to a candidate and his authorized political committee ($1,000), to a political committee established by a national political party ($20,000), or to any other political committee ($5,000) in any calendar year. 2 U.S.C. § 441a(a)(1).

## II. *Plaintiffs' Claims*

The plaintiffs in this action are the national committee of the Republican Party, a New York corporation whose members are politically active registered Republicans, and two individual residents of New York State who are politically active, registered Republicans. Plaintiffs challenge the Fund Act's requirement that a major party presidential candidate certify, as a condition of eligibility for public financing, that he will not raise or spend private funds and the FECA's direct prohibition against such expenditures. Plaintiffs' goal is to enable the 1980 Republican presidential candidate to raise and spend both public and private funds and to permit his supporters to make coordinated expenditures on his behalf.

The complaint sets forth six causes of action. First, plaintiffs contend that the statutory scheme violates the First Amendment in that it conditions eligibility for federal campaign funds upon compliance with unconstitutional expenditure limitations and thereby restricts the ability of

**6.** A "major party" is one whose candidate for the office of President in the preceding Presidential election received, as the candidate of such party, 25 percent or more of total of popular votes received by all candidates for such office. 26 U.S.C. § 9002(6). The candidate of a "minor party", a political party whose candidate received between 5 and 25 percent of the total popular votes in the preceding Presidential election, *id.* § 9002(7), or a "new party", a political party which is neither a major party nor a minor party, may also, at his option, receive public funding. *Id.* § 9004(a)(2), (3).

**7.** 26 U.S.C. § 9006 establishes this fund on the books of the United States Treasury and charges the Secretary of the Treasury with transferring monies to the fund not in excess of the amounts designated by federal taxpayers

pursuant to a tax-checkoff mechanism set forth in 26 U.S.C. § 6096.

**8.** Private contributions are permitted if there are insufficient monies in the Presidential Election Campaign Fund to permit full funding of all candidates.

**9.** The national committee of a political party, however, may incur expenses on behalf of its presidential candidate, even if he accepts public funding, "[in] an amount equal to 2 cents multiplied by the voting age population of the United States." 2 U.S.C. § 441a(d). In 1976, the national party committees were each permitted to spend $3,203,786.96 on behalf of their presidential candidates' campaign. (Defendants' Exhibit M, at 4).

candidates who opt for public funding, and their parties' supporters and potential contributors, to communicate their political ideas. Second, plaintiffs allege that the statutes violate the First Amendment because the Republican presidential candidate in 1980 must, as a result of certain "legal and practical factors," accept public funding and agree to comply with the unconstitutional expenditure limitations. For their third and fourth causes of action, respectively, plaintiffs claim that the statutes discriminate against presidential candidates challenging incumbent Presidents and against candidates who lack support among labor organizations in violation of the First and Fifth Amendments. Finally, for their fifth and sixth claims, plaintiffs assert that the statutes are both unconstitutionally overbroad and in violation of their retained rights under the Ninth Amendment.

Plaintiffs have tendered evidence relating to each of their first four causes of action. Thus, plaintiffs have attempted to show that: A. the challenged statutes abridged political expression in the 1976 presidential campaign (first and second causes of action); B. the Republican presidential candidate will, as a practical matter, be required to accept public funding in 1980 (second cause of action); C. the statutes discriminate against presidential candidates who run as challengers against incumbent Presidents (third cause of action); and D. the statutes discriminate against presidential candidates without substantial labor union support (fourth cause of action). Each of these basic factual contentions will be reviewed *seriatim.*

10. Thus, Cardamone testified, for example, that in 1972, he personally rented a U-Haul trailer for $250, filled it with Nixon for President brochures printed at the expense of the New York State Committee to Re-Elect the President, and distributed the brochures to students at upstate New York college campuses. (Cardamone Dep. 14–17). Cardamone stated that he would like to use his own funds for republication of the Republican candidate's campaign literature in 1980. (*Id.* at 36).

### III. *Findings of Fact*

The following constitutes the joint findings of fact pursuant to Rule 52(a), Fed.R. Civ.P. of the single-judge and three-judge courts.

### A. *The Statutory Impact Upon Public Participation in the 1976 Presidential Campaign*

#### 1. *The Parties*

Plaintiffs contend that the challenged statutes decreased citizen participation in the 1976 publicly financed presidential election campaign below what it would have been had the campaign been privately financed and that they will inevitably do so again in 1980. Plaintiff Cardamone, a politically active Republican, has made small contributions and coordinated expenditures in Presidential campaigns prior to 1976 and wishes to do so again.[10] Similarly, plaintiff Schmid, Chairman of the Board of plaintiff Ripon Society of New York, Inc., has made personal expenditures on behalf of candidates in New York State campaigns and testified that both he and members of his organization would like to make small contributions and coordinated expenditures on behalf of the 1980 Republican candidate (Schmid Dep. at 27–30, 39). Plaintiff Republican National Committee, the official leadership body of the Republican Party, has authorized the commencement of this suit for the purpose of restoring the right of members, adherents and supporters of the Republican Party to support the 1980 presidential candidate through local organizational activities that will involve the expenditure of funds in coordination with the candidate's campaign. (Deposition of William E. Brock, III, at 22).[11]

11. Only two of the major candidates for the Republican presidential nomination have made a final decision whether to accept public funding for the general election campaign should they win the nomination. John B. Anderson and George Bush have decided to accept public funding; Mr. Bush has done so believing that he has no practical alternative. (Defendants' Exhibits O, Q). Howard Baker, John Connally, Robert Dole and Ronald Reagan remain undecided (Defendants' Exs. P, R, S, T). It is unclear from the record whether former President Ford would opt for public funding.

The 1976 presidential campaign was the first to be subject to the contribution and expenditure provisions of the FECA and the Fund Act. Assessing the impact of these statutes upon citizen participation in the 1976 campaign and its potential impact upon future elections is a difficult task, for it requires both a comparison between the role "that grass roots" activities have traditionally played in presidential elections and their role in the 1976 campaign, as well as an attempt to isolate the effect of the statutes' operation from a myriad of other factors that influence public participation in the political process.

## 2. Defining "Grass Roots"

The term "grass roots", as it has been used by the parties and several of the witnesses, embraces a wide variety of political activities engaged in by individual citizens in support of the candidate of their choice. Among the many activities identified in the record as being encompassed within the term "grass roots" are door-to-door canvassing, distributing printed campaign material (e. g., brochures, bumper stickers, buttons and yard signs), organizing political rallies, manning telephone banks, operating storefront headquarters, recruiting campaign volunteers, participating in voter registration and get-out-the-vote drives, organizing speakers' bureaus, erecting campaign billboards, designing and placing newspaper advertisements, and drafting position papers for candidates on local issues. (Deposition of Paul C. Cardamone, at 10–20; Schmid Dep. at 12–20; Deposition of Haley R. Barbour at 69; Deposition of Charles R. Black, Jr. at 67, 70; Brock Dep. at 16–17).

Some "grass roots" activities require the individual citizen to contribute only his time and effort; the individual, as opposed to the candidate or his campaign committee, incurs no out-of-pocket cost for engaging in these political activities (e. g., distribution by hand of brochures printed at the expense of the candidate's national campaign committee). Other forms of "grass roots" participation, however, obviously involve the expenditure of the individual's own funds on behalf of the candidate of his choice (e. g., placing a newspaper advertisement). Thus, prior to 1976, "grass roots" activities were traditionally funded both from the "top down" (i. e., expenditures by the candidate's national campaign committee or by national, state or local political parties on behalf of the candidate) or from the "bottom up" (i. e., expenditures by individual supporters). The funds to operate a local storefront headquarters, for example, might have been provided either by the candidate's national campaign committee or by local supporters who "passed the hat" at a political rally. (Barbour Dep., at 39–41; Deposition of Terrence M. O'Connell, II at 17–20).

The statutory limitations on expenditures by, and the prohibition on contributions to, presidential election campaigns altered the manner in which grass roots activities were financed in 1976. The factual issues to be resolved are whether grass roots activities were diminished in 1976 in comparison to prior presidential elections and, if so, the extent to which the decreased activity may be attributed to the operation of the challenged statutes.

## 3. Grass Roots in 1976—Assessing the Statutory Impact

Plaintiffs have adduced substantial evidence showing that grass roots participation in the 1976 presidential campaign was low by comparison to prior presidential campaigns. High-level operatives from both the Carter and Ford campaigns testified to the pronounced lack of visibility of the campaigns at the local level and attributed the lack of local storefronts and bumper stickers to the fact that the two campaigns adopted similar budgetary priorities. In allocating the $22 million in public funds to the various campaign needs, both the Carter and Ford national committees emphasized television and other mass media over local field activity. (Barbour Dep. at 21–24; O'Connell Dep. at 26–31; Deposition of Mark A. Siegel at 35–37). As plaintiffs'

witness Terrence O'Connell, the California coordinator of the Carter-Mondale campaign, testified about the Carter budgetary strategy:

> We said the first thing to cut out is buttons and bumper stickers; people don't use them and don't look at them. They should be the first thing to go.

(O'Donnell Dep. at 31–32). The Executive Director of the Democratic National Committee in 1976 stated that Carter's staff believed that use of mass media "was the most direct way to influence political participation." (Siegel Dep. at 36). Sharing the belief that mass media are the "most cost effective way" to influence public opinion, the Ford campaign developed the same budgetary priorities. (Deposition of Douglas L. Bailey, at 34). *See also* Brock Dep. at 21, 39. As plaintiffs' witness Haley Barbour, Regional Director for the Ford campaign in the Deep South, described the decision to emphasize mass media:

> [Y]ou have [only] so much money for carrying the message and the most effective way for these kind of bucks was in advertising, in media, in direct mail, reach the most people with the most targeted message  .   .   .

The impact of these budgetary policies upon various forms of grass roots activities was dramatic. Plaintiffs' witness Barbour testified that the Ford campaign's allocation for each Deep South state ranged from $10,000 for Arkansas to $20,000–$30,000 for Florida. (Dep. at 21). Campaign materials such as bumper stickers, brochures, and yard signs were in very short supply in the region in 1976 by comparison to recent Mississippi gubernatorial and United States Senatorial campaigns in which Barbour had been actively involved. (Barbour Dep., at 30–32, 38). Virtually every day of the campaign, individuals complained to Barbour

about the absence of campaign materials (*Id.* at 30–31). Because of the short supply of these materials, traditional volunteer activity such as bumper sticker "blitzes", yard sign programs and leafleting of factories and shopping centers did not take place. (*Id.* at 32). Similarly, no county or local storefront headquarters were set up by the Ford national committee in the Deep South. (*Id.* at 39).[12] The testimony of plaintiff Paul Cardamone (Cardamone Dep. at 37), plaintiff's witness Charles Black, political assistant to Republican Vice Presidential candidate Robert Dole (Black Dep. at 35, 69–70) and Republican National Chairman William E. Brock III (Dep. at 19–21) suggests that the Ford campaign's lack of emphasis upon grass roots activities was not unique to the Deep South.[13]

Despite the populist tenor of the Carter campaign, it, too, suffered from a "lack of visibility" at the grass roots level. The campaign was "top heavy" in that there was very little volunteer work, get-out-the-vote drives, or other local activity (Siegel Dep. at 36). Plaintiffs' witness Siegel served as the liaison between the Carter campaign and the state Democratic parties and was in continual phone contact with state and local party organizations. (Siegel Dep. at 4, 23–24). These local organizations frequently complained to Siegel about the lack of printed campaign materials. (*Id.* at 24). The biggest gripes came from states which were "untargeted", *i. e.*, those which the Carter staff determined to be either too small to warrant large expenditures or too certain to be won or lost for expenditures of any size to have an impact (*Id.* at 25). But complaints were also registered in "targeted" states, and mistrust developed between the national campaign and the state Democratic parties over the lack of buttons, pos-

---

**12.** The Republican National Committee did finance the operation of a small number of phone banks in the region in coordination with the Ford campaign, as permitted by 2 U.S.C. § 441d. (Barbour Dep. at 34). *See* note 9 *supra*. The storefronts in which these phone banks were established, however, were not used for any other sorts of grass roots activity

such as the storage and distribution of campaign literature. (Barbour Dep. at 40–41).

**13.** Cardamone testified to the absence of a visible Ford campaign in Albany County and the lack of a county campaign headquarters, and Black and Brock testified that there was little local organizational work for Ford throughout the country.

ters, and bumper stickers. (*Id.* at 25–28). Plaintiffs' witness O'Connell contrasted his experience in the 1972 McGovern campaign in Michigan, in which substantial door-to-door canvassing and get-out-the-vote drives were coordinated from 82 storefronts and 20 headquarters located throughout the state with his experience as the Carter campaign coordinator for California in 1976. (O'Connell Dep. at 15–23). O'Connell's budget for field operations in California was $288,000, a sum designed to cover rental of headquarters, salaries for paid field staff, leaflets, equipment rental and a get-out-the-vote campaign. (*Id.* at 35–36). This was substantially larger than the average state field appropriations budget of $50,000–$60,000 (*Id.* at 34). The Carter campaign had only four headquarters in all of California, one each in the state's four largest cities. (*Id.* at 37). In addition, the campaign shared the use ·of twenty "unified" Democratic headquarters with various local candidates (*Id.* at 90). Additional storefronts were not opened because the campaign did not allocate sufficient money to do so, and coordinated expenditures by supporters for the purpose was not permitted. (*Id.* at 91–92, 105). Little effort was concentrated in rural areas because they were sparsely populated; efforts were concentrated in marginal areas (*Id.* at 43–44). The campaign in California managed to attract many volunteers, but there was little for them to do. (*Id.* at 59). No real canvassing effort was undertaken due to the lack of storefronts from which to conduct such activity. (*Id.* at 55–56). The "lack of visibility" of the campaign, especially buttons, leaflets and bumper stickers bewildered and alienated local supporters. (*Id.* at 48–49). Because of the limited resources, the California campaign centered on a get-out-the-vote campaign in the last four or five weeks of the campaign. (*Id.* at 57–61).

When supporters of Ford and Carter were told that the candidate's budget did not include allocations for storefronts, brochures, local advertising or other such activity, many of them volunteered to contribute these items to the campaigns. (Barbour Dep. at 36, 46–47, 53–54, 58; O'Connell Dep.

at 51, 92–96, 102; Siegel Dep. at 31–32). In the towns of the Deep South, for example, where the local Republican Party rarely maintained storefronts year round, and campaign storefronts were generally financed locally by "passing around the hat" or by borrowing space and furniture, Ford supporters offered to do the same in 1976. (Barbour Dep. at 44–46). Similarly, Carter supporters in California volunteered to contribute storefront headquarters. (O'Connell Dep. at 51). Many of these proposed expenditures were in small amounts (*Id.* at 102). Campaign officials were constrained to reject these offers and to explain to supporters that federal law prohibited such "coordinated expenditures." (Barbour Dep. at 46, 54–56; O'Connell Dep. at 51–53, 92; Siegel Dep. at 31–32). There were instances in which individuals opened Carter storefronts, and campaign officials asked these individuals to close the storefronts for fear that the money expended in such storefronts would be charged against the Carter campaign. (Siegel Dep. at 31–32). The reaction of supporters to the effect of the new law was one of "anger", "disbelief" and "disgust". (Barbour Dep. at 58–59; O'Connell Dep. at 52–53). Some campaign officials would occasionally inform supporters that they had a statutory right to make independent expenditures (Siegel Dep. at 62), but others were reluctant to do so and even actively discouraged independent expenditures fearing that the expenditures would be considered to have been "authorized" by the campaign. (Barbour Dep. at 55–57, 74).

There is, of course, some evidence in the record of effective grass roots activity. Citizens desiring to participate in the campaign were able to engage in a variety of activities in coordination with the campaign which did not require the expenditure of their own funds. Thus, defendants' witness Herschel V. Beazley testified concerning his efforts on behalf of Jimmy Carter as a member of the "Peanut Brigade", a group of approximately 50 Georgian volunteers who did door-to-door canvassing and facto-

ry leafleting in the State of Iowa. (Beazley Dep., 8–10).[14] Defendants' witness O'Connell testified that there were no fewer volunteers in 1976 than there were in 1972. (O'Connell Dep. at 59). Because the campaigns allocated so little to grass roots activities, however, there were not "as many places for [volunteers] to go or as many things for them to do" as in prior presidential campaigns. (*Id.*) Although some independent expenditures were made by supporters of the candidates (Barbour Dep. at 73–74; O'Connell Dep. at 95), it is nonetheless clear that many of these supporters would have preferred the opportunity to coordinate their expenditures with the campaigns. (O'Connell Dep. at 96; Siegel Dep. at 36; Black Dep. at 36; *see* Cardamone Dep. at 34, 42; Schmid Dep. at 28–29). The record as a whole supports the conclusion that, notwithstanding the opportunity to volunteer one's services without compensation and to make independent expenditures, "grass roots" activity was less intense in the 1976 presidential campaign than it had been in earlier campaigns.[15]

Some of the decline in citizen participation in the 1976 campaign, however, may be attributable to factors other than the challenged statutes. Even prior to 1976, presidential campaigns emphasized mass media and television in particular, at the expense of grass roots activities. As RNC Chairman Brock testified:

> Certainly the methodology of politics has changed enormously since the advent of mass communications, mass media and primarily television. But the change has been because the people took an easy route and became dependent upon television and both parties allowed their root structure to begin to dry up because even without the law that does exist to presidential campaigns, as it does now, there is a finite limit to what a candidate can raise in almost any campaign.

(Brock Dep. at 37–38). Thus, even prior to 1976, campaign workers frequently complained of "a shortage of buttons and bows." (Bailey Dep. at 33). Another factor influencing the level of grass roots participation is the extent to which the candidates' personalities or the issues of the day capture the public's imagination. Thus, defendants' witness Peter D. Hart, an experienced pollster, attributed some of the decline in public participation in the 1976 campaign to the candidates' failure to "energize" the electorate. (Hart Dep. at 12–13, 68; *see also* Brock Dep. at 39–41). The frequently noted public disillusionment with politics after the Watergate crisis may have also played a role. (Hart Dep. at 12, 68). The very newness of the FECA restrictions undoubtedly engendered confu-

14. Since the value of services provided without compensation by individuals who volunteer a portion of their time is not a "contribution", 2 U.S.C. § 431(e)(5)(A), the Peanut Brigade's performance of these services did not violate the challenged statutes. The Carter campaign furnished the leaflets and the cost of transportation. The volunteers themselves, however, paid for food and hotels (Beazley Dep. at 12). These small disbursements for food and lodging are exempted from the statutory definition of "expenditure". 2 U.S.C. § 431(f)(4)(D), (E).

15. Plaintiffs' evidence on this point stands virtually unrebutted. Defendants seek to introduce into evidence the results of the National Election Studies, a research poll conducted by the Political Behavior Program of the Survey Research Center of the Institute for Social Research and by the Center for Political Studies, both of the University of Michigan. (Defendants' Exhibit B). Plaintiffs' sole objection to the admission of the results of this poll is on the ground of relevance (letter from Plaintiffs' counsel to the court, July 25, 1979). Since Plaintiffs' objection goes more to weight than admissibility, it is overruled and Exhibit B is admitted into evidence. The poll represents an attempt to measure various forms of citizen participation in political campaigns since 1952. The results, however, are apparently not restricted to general election campaigns for President. Most of the questions posed either seek information bearing upon the respondent's interest or participation in the "campaign" or ask whether the respondent engaged in certain activities without reference to any particular election. Thus, the responses compiled in the tables comprising Exhibit B may refer to Senatorial, Congressional state and local elections as well as Presidential elections, and it is difficult to infer anything therefrom with respect to public participation and interest in general election campaigns for President.

sion among campaign officials,[16] who on occasion deterred supporters from making lawful independent expenditures. (Barbour Dep. at 55–57, 74).[17]

In the final analysis, however, the record demonstrates that the amount of citizen participation in the 1976 election, where the candidates opted for the statutory expenditure limitation mandated for public financing, was less than in the previous presidential campaign, where the parties through private financing raised funds substantially in excess of the limitation. Thus, defendants' witness Bailey, the media supervisor to the Ford campaign, testified that if more money had been available to the Ford campaign, more funds would have been allocated to local activities (Bailey Dep. at 35). It is, however, somewhat uncertain whether increasing the amount of funds to be spent by the candidates' national committees would have resulted in the allocation of additional funds to local activities or the allocation of even greater amounts to mass media at the expense of local activities. See Hart Dep. at 64. The effect of the statutes upon individual supporters who wished to make coordinated expenditures on behalf of candidates, however, is far more certain. By prohibiting these individuals from making all such expenditures, the challenged statutes clearly curtailed funding of grass roots activities from the "bottom up."[18]

## B.  The Voluntariness of Public Financing

Plaintiffs, for their second cause of action, allege that presidential candidates must, as a practical matter, accept public financing of their campaigns. Although the Fund Act, as drafted, creates a voluntary system of public financing, plaintiffs contend that the provisions of both the FECA and the Fund Act, and the practicalities of raising contributions under the dollar limits per contributor these statutes impose, effectively compel the candidate to accept public funding.

Plaintiffs' principal evidence in support of this claim is the testimony of Charles R. Black, Jr., presently the Deputy Chairman and Political Director of the Reagan for President Committee and Midwest Coordinator for the Citizens for Reagan Campaign in 1976. (Black Dep., at 3, 11–12). Largely on the basis of his experience in direct-mail fund raising with the Reagan campaigns and elsewhere, Black has concluded that it is not feasible for presidential candidates to forego the public lump sum grant of $20 million, as adjusted for inflation (Id. at 16). By Black's calculation, a presidential candidate who rejects public funding would have, depending on when his party's convention was held, between 80 and 120 days to raise private funds. Because time is needed to plan fund raising efforts, Black determined that the actual amount of time available for fund raising is between 60 and 70 days. (Id. at 26–27). Black discounted any candidate's ability to raise money for the general

**16.** The FEC is empowered to render advisory opinions concerning the application of the provisions in the Fund Act. Any person involved in the specific transaction or activity as to which the advisory opinion is requested or in a transaction or activity which is indistinguishable in all material aspects may rely upon the advisory opinions without fear of sanctions. 2 U.S.C. § 437f. It is unclear from the record how frequently persons involved in the campaign took advantage of this option.

**17.** In addition, neither national party committee expended the full amount permitted under 2 U.S.C. § 441a(d). See note 9 supra. The Democratic National Committee spent approximately $2.8 million on behalf of Carter's campaign; the Republican National Committee spent approximately $1.9 million on behalf of the Ford campaign.

**18.** It does not necessarily follow, however, that the statutes' curtailment of grass roots activity had any bearing upon the outcome of the election. Plaintiffs' witness Black speculated that local community activities have an impact on elections of roughly 2% to 5% (Black Dep. at 38), but no basis was offered for this figure. Defendants' witness Bailey, a Ford campaign media strategist, testified that more "buttons and bows" would not have influenced the outcome in 1976, and would simply have made local supporters happier. Asked if having more money to spend would have made a difference in the outcome, Bailey responded: "If we couldn't do it with $22 million, we could not have done it with $62 million." (Bailey Dep. at 27).

election prior to winning the nomination on the ground that a candidate lacks credibility among potential contributors until he is the nominee and a candidate would be reluctant to compete with himself for contributions during the primary season. (*Id.* at 31–32, 79). Moreover, since fund-raising costs generally equal 20% of the amount raised, the candidate who chooses to reject federal funding would have to raise appreciably more than the amount of the public grant to warrant the effort. (*Id.* at 25).

Though acknowledging the existence of other forms of fund-raising, Black testified that "direct mail" is the most effective technique, albeit an expensive one (*Id.* at 32–33). Direct mail fund-raising involves the use of "prospect" lists of persons likely to be favorable to the candidate seeking support. An acceptable rate of return on an initial mailing is approximately 2%. Thus, to get 100,000 contributions from an initial mailing, a candidate would generally have to mail 5 million letters. (*Id.* at 103–04). The percentage return from subsequent mailings to contributors found on the initial mailing is higher, approximately 8 to 10%. (*Id.*) Thus, it would require an additional 800,000 to 1,000,000 more mailings to get another 100,000 contributions. The cost of printing and mailing one fund raising letter with first class postage is between 25 and 30 cents. (*Id.* at 105). In the 1976 primary campaign, Reagan raised an average of $48.75 from 185,000 contributors or slightly over $9 million gross, an amount far less than that available from the public fund. (*Id.* at 13–14, 102). Based on this showing, the Reagan campaign determined in the summer of 1976 that if Reagan were to win the nomination, he would accept public funding for the general election. (*Id.* at 15, 76–79). Although Reagan has made no final decision with respect to financing his 1980 campaign, Black testified that Reagan is likely to choose public financing if he wins the nomination. (*Id.* at 24–25).

Black further testified that the use of direct mail techniques would create serious cash flow problems even if an amount appreciably greater than the public fund could eventually be raised. There is a time lag between the mailing of contribution letters to prospects and the receipt of contributions. Printing and postage for direct mail must generally be paid in advance (*Id.* at 30), as well as many campaign services, such as media and travel. (*Id.* at 28–29). Moreover, there is a substantial risk in deciding not to take public funds because the statute does not permit the candidate to reverse his decision and choose public funding once he accepts a private contribution. (*Id.* at 31).

Black's testimony regarding the nature of direct mail and its limitation as a fund-raising technique stands unrebutted. Nevertheless, the court finds that Black's analysis of the *overall* fund raising potential of presidential campaigns rests upon several doubtful assumptions. First, the analysis posits almost total reliance upon direct mail fund raising. As several witnesses testified, there are many other techniques by which a presidential candidate can raise funds. Between 1972 and 1976 for example, the Democratic National Committee organized several national "telethons" in an effort to eliminate the debt incurred in the 1968 presidential campaign. The net proceeds totalled $3.6 million. (Siegel Dep., at 11–15). Other options include personal solicitation, telephone or closed-circuit television solicitation and fund raising events such as dinners, receptions, rallies, concerts and auctions. (Black Dep. at 32; Hart Dep. at 18–21, 51–59; Bailey Dep. at 19; Siegel Dep. at 57). There is no reason why these techniques could not be used effectively in conjunction with a direct mail campaign. Second, the analysis assumes that a candidate cannot begin private fund raising for the election campaign until after he has been nominated. There is often a lag of several weeks, between the last primary and a party's nominating convention; even in the closest race for the nomination, the winning candidate would be able to begin general election fund raising well before the day of his actual nomination with the fund-raising machinery from his primary

campaign still intact. (Hart Dep. at 61–62). The risk of taking private funding only to discover that an amount exceeding the public grant cannot be raised is a great one, but it is a risk that can be measured on the basis of the candidate's fund-raising experience during the primaries. Moreover, the candidate may have excess funds from his primary campaign which may be transferred to his general election campaign funds. (*See* Black Dep. at 98). Third, Black's conclusions regarding the overall fund-raising potential of presidential candidates is based upon the Reagan campaign's ability is raise funds in the midst of a fiercely contested *primary* campaign during which Reagan sought to unseat an incumbent President. The ability of a party nominee to raise funds privately is arguably enhanced because his chances of achieving the ultimate victory are perceived as being much greater. Moreover, the party nominee may draw upon support from his former primary opponents; the potential for raising funds from all segments of the party is increased. In the 1976 presidential primary campaign, the two Republican candidates *together* raised over $18.5 million in private funds, and the thirteen Democratic candidates over $25.0 million. (Defendants' Exhibit U, FEC Disclosure Series No. 7, at 7). Fourth, Black's analysis underestimates the potential for raising large contributions from individual donors and political action committees. Individuals may contribute up to $1,000 to a privately funded campaign; political action committees up to $5,000. 2 U.S.C. § 441a(a). Reagan did not pursue political action committee contributions in 1976 because many of these committees were new and lacked funds for presidential campaigns (Black Dep. at 60, 85). There are many more political action committees active today and they are far better funded.

(*Id.* at 60). Similarly, the Reagan primary campaign did not pursue large donors because contributions in excess of $250 were not eligible for matching federal funds pursuant to Chapter 96 of the Internal Revenue Code. (*Id.* at 58). In a general election campaign, however, there would be a much greater incentive to pursue $1,000 donors. Finally, the cash flow problems inherent in private funding may be overstated in the plaintiffs' analysis. As the Ford campaign's media planner and production supervisor testified, media, one of the largest and most critical campaign expenditures, must be paid for only several days, not several months, in advance. (Bailey Dep. at 22–23).

The ability of nominated presidential candidates, as opposed to primary candidates, to raise the requisite amounts privately would be more relevant to the issue at hand. Plaintiffs have made no showing regarding the reasons behind the Ford campaign's decision to accept public funding in 1976. Several witnesses suggested that the Carter campaign opted for public funding as much out of ideological commitment, as out of uncertainty whether the necessary amount could be privately raised. (O'Connell Dept. at 81–82, 84; Siegel Dep. at 21). In 1972, prior to the enactment of the FECA contribution limitations, the Nixon campaign raised $60.2 million, and the McGovern campaign raised $38.7 million. Plaintiffs have not attempted to show that sums exceeding the amount of the public fund could not be privately raised in 1980 by indicating the extent to which the Nixon and McGovern sums were comprised of contributions in excess of $1,000. The court must conclude that plaintiffs have failed to show that presidential candidates are compelled, as a practical matter, to accept public funding.[19]

19. In reaching this conclusion, the court did not consider the publications *Financing the 1968 Election* and *Financing the 1972 Election* by Herbert Alexander, offered by defendants as proof of various fund-raising practices in elections prior to 1976. The plaintiffs objection to the admission into evidence of these publications as hearsay is sustained. The court has considered, however, the testimony of defendants' witness Hart and Bailey, despite plaintiffs' objections to their testimony as opinion evidence from unqualified experts. Although their principal campaign expertise is as a pollster and media advisor, respectively, both witnesses have had extensive experience in formulating campaign strategy and participating in budgetary and fundraising decisions. (Hart Dep. at 8, 14, 47–48; Bailey Dep. at 3–5).

### C. Advantages of Incumbency Under the Statutes

Plaintiffs challenge the constitutionality of the FECA and the Fund Act on the ground that the limitation on expenditures discriminates against candidates who challenge incumbent Presidents. Plaintiffs contend that incumbent Presidents enjoy various perquisites and advantages solely by virtue of the office, the equivalent of which is available to challengers solely by the expenditure of funds.[20]

In support of this claim, plaintiffs have offered deposition testimony, exhibits and the results of a statistical survey which attempts to analyze comparative expenditure patterns of the Ford and Carter campaigns in 1976. Two of plaintiffs' proposed findings are uncontradicted in the record: 1. an incumbent President and those travelling with him on campaign trips pay only the cost of a first class airline ticket for the use of Air Force I, while a challenger must charter a plane to undertake similar trips; (Black Dep. 40–42);[21] and 2. an incumbent may use the researchers and speech writers who work in his administration at no cost, while a challenger, except for volunteer services, must spend funds to hire campaign staff and develop information to formulate policy (*Id.* at 42).

Through both depositions and the statistical study, plaintiffs have also sought to prove that: 1. in 1976, by virtue of his office, Ford was able to make news through his daily duties in the White House, while Carter was obliged to travel around the country in order to attract media attention as evidenced by Carter's larger expenditures for travel, personnel and occupancy (Black Dep. at 41–44; 91–93; *compare* Plaintiffs' Ex. No. 2 and Plaintiffs' Ex. No. 36, at pp. 19–20 *with* Plaintiffs' Ex. Nos. 4 and 6 and Plaintiffs' Ex. No. 34 at 19–20); and 2. Carter had to spend heavily early in the campaign while Ford was able to husband his resources for the stretch drive. (Plaintiffs' Ex. 33 and 35; Plaintiffs' Trial Memorandum, Appendices A–D). Defendants object to the admissibility of the results of the statistical study and working papers generated in the course of the analysis introduced for the purpose of establishing the methodology utilized. Defendants also challenge the accuracy of the study as a basis for comparing the expenditures made by the two campaigns. The court determines that the results of the study and the underlying documentation are admissible;[22] defendants' objections go more to the accuracy of the study and the weight to be given its findings than to admissibility.

The methodology employed to conduct the statistical study is as follows. The data utilized in the study were found in copies of reports filed by candidates Ford and Carter with the FEC as required by law in 1976. (Plaintiffs' Ex. 16–22). *See* 2 U.S.C. § 434. These FEC reports contain information with respect to each transaction (*i. e.,* expenditure or refund) entered into by the respective campaign including the purpose, the date and the amount. Amy Gilbert, an independent certified public accountant retained for this purpose, supervised the RNC staff in the sampling and the classification of transactions. Categories of expenditure were derived from the descriptions used by

---

**20.** It is unclear the extent to which plaintiffs' claim of discrimination against challengers is premised upon their contention that all candidates are effectively compelled to accept public funding. It may be argued that a challenger retains the option to reject public funding and to raise and spend sufficient privately raised funds to nullify any of the incumbent's alleged advantages. In any event, it is by no means certain that the 1980 Democratic candidate will be an incumbent (Defendants' Ex. D).

**21.** At one point in his deposition defendants' witness Bailey testified that the cost per mile to move a President is greater than for a challenger. (Bailey Dep. at 6.) He subsequently clarified his testimony, however, by stating that "the overall cost to the Government and the Committee had to be greater than the per mile cost for the Carter campaign." (*Id.* at 29). In any event, the witness admitted that he had not seen any "figures" and that his testimony was "purely a guess and could be entirely wrong." *Id.* at 30.

**22.** Defendants object to the admission of the results of the survey on hearsay grounds. The court determines that the survey is admissible pursuant to Rules 803(24) and 1006, Fed.R. Evid.

the candidates in their respective reports; Carter used some 64 different types of description in his reports, while Ford used 852 different descriptions. (Deposition of Amy Gilbert at 83). From this universe of descriptions, Ms. Gilbert and the RNC Research Department derived a single expense category list (Plaintiffs' Ex. 25), comprised of 15 major expense categories, several of which were broken down into subcategories. After consultation with Dr. Rex Brown, a statistician retained by the RNC for this purpose, Ms. Gilbert and her staff sampled the 13,000 transactions reported by the Ford campaign and the 27,000 transactions reported by the Carter campaign in the following manner. In phase one of the sampling procedure, approximately 5,000 transactions from each of the Ford and Carter reports were sampled by the selection of every third transaction in the Ford reports and every sixth transaction in the Carter reports. (Gilbert Dep. at 16). The second phrase involved the selection of every transaction in excess of $2,000 in the Ford and Carter FEC reports. (*Id.* at 35–37). Each sampled transaction was assigned a code number corresponding to a category (or sub-category) on the expense category list (Plaintiffs' Ex. 25). Finally, in phase three of the analysis, every transaction in the Ford and Carter reports in an amount equal to or greater than $200 but less than $2,000 in three expenditure categories—media, travel and events—was added to the sample. (*Id.* at 40–41). All sampled transactions were entered into the RNC computer, which was programmed to generate the following analysis: 1. Ford and Carter campaign expenditures by week (Plaintiffs' Exs. 33, 35); 2. Ford and Carter campaign expenditures by category and, within each category, by week (Plaintiffs' Exhs. 34, 36); and 3. Ford and Carter campaign expenditures by subcategory and, within each subcategory, by week (Plaintiffs' Exhs. 37, 38).

Defendants raise several significant objections to the accuracy of the study as a comparison between Ford and Carter campaign expenditures. First, defendants contend that the study is inaccurate because the FEC reports necessarily reflect the subjective judgments of those persons in each campaign responsible for reporting expenditures to the FEC. Thus, to the extent each campaign was inconsistent in its characterization of transactions, or to the extent that the two campaigns characterized similar expenditures differently, mistakes in categorization were certain to result. Indeed, there are several vague "catch all" categories for which one campaign reported expenditures and the other did not (*e. g.*, "Vice President", "Voter Registration", "Get-Out-the-Vote"). Plaintiffs respond to this argument by noting that the number of expenditures reported in the categories that are unique to one campaign are *de minimus* and that comparisons between *major* categories of expenditure common to both campaigns (*e. g.*, "travel", "media", "outside services") are valid. It is difficult to see why that should be so. Large discrepancies within a major category may simply reflect different modes of reporting expenditures. (Gilbert Dep. at 99). If, for example, one campaign reported a direct mail expenditure as "postage", the expenditure was placed in Category 23 ("Postage") as opposed to Category 53 ("Direct Mail"). If the same (or the opposing) campaign reported a similar expenditure as "direct mail", it was placed in Category 53. Since Ms. Gilbert and her staff generally followed the language of the FEC reports in assigning a category to a transaction, the study reflects any category discrepancies traceable to the persons who filed the reports. (*Id.* at 79–80, 139). As defendants' expert statistician testified, there is no reason, as a matter of statistical theory, to expect errors of miscategorization by campaign staff to "cancel each other out." (Deposition of Charles R. Mann at 13).

Another shortcoming of the study is its failure to include expenditures made by the national committees of both the Republican and Democratic parties pursuant to 2 U.S.C. § 441a(d). (Gilbert Dep. at 101). In the 1976 campaign, the RNC spent approximately $1.9 million on behalf of Ford, and

the DNC spent $2.8 million on behalf of Carter. The failure to include these amounts in the analysis of campaign expenditures, leaves approximately 8% to 12% of each campaign's total outlay unaccounted for.

In addition, there are problems with respect to the use of the study to draw conclusions about the timing of campaign expenditures. The data reported to the FEC concerned the date payment was made to a vendor, rather than the date on which an expense was incurred. (Mann Dep. at 46–49). Even if the data may be read to indicate that Ford made payments later in the campaign than Carter, there is insufficient evidence in the record from which it could be inferred that Ford incurred his expenses later than Carter. The President Ford Committee sought to pay its invoices as quickly as possible and generally paid vendors within one week (Deposition of Arlene Triplett, at 11–12) until the campaign became very active in late October 1976 when it often took at least two weeks to make payment. (Id. at 37). No evidence has been offered concerning the speed with which the Carter committee paid its invoices. Another problem with respect to timing is that the study begins with the week of July 25, 1976, with the Carter campaign's initial expenditures. Since the Republican convention was not convened until one month later, the Carter campaign's pattern of "earlier" expenditures may simply reflect its earlier start.

Finally, it is surprising that plaintiffs did not present evidence of the results of statistical tests of significance to determine whether the observed differences between Carter and Ford expenditures represent true differences rather than chance occurrences.

Assuming for the sake of argument, however, that plaintiffs' statistical survey is an accurate measure of the Carter and Ford campaign expenditures in 1976, plaintiffs' conclusions that the Carter campaign incurred greater travel expenses than the Ford campaign and that the Carter commit-tee spent substantially more money early in the campaign while the Ford committee husbanded resources for the stretch drive, do not demonstrate that the challenged statutes will inevitably disadvantage *all* challengers in these respects. The 1976 campaign was a single election, and the strategies adopted by the candidates and the budgetary impact of those strategies, do not necessarily reflect the optimal strategies and spending patterns available to the candidates in that campaign cannot be utilized to predict strategies and spending decisions in future campaigns when the issues, personalities and political climate will undoubtedly be different. (Mann Dep. at 19–21). The Ford campaign's "Rose Garden Strategy", the decision to keep Ford in Washington while Carter travelled around the country, was designed to create the public perception of Ford as "the President" and Carter as a "mere candidate." (Bailey Dep. at 6). As Ford's media advisor testified, that strategy was adopted because it was determined that it best fit Ford's personality and campaign abilities. (*Id.* at 37; *see also* Black Dep. at 100). A candidate, who by contrast, wished to cultivate a populist image would probably commit more funds to travel. The timing of campaign expenditures similarly implicates questions of campaign strategy. A challenger who determines that later expenditures would be more beneficial to his chances of election than earlier ones obviously retains the option to delay spending. Neither the challenged statutes nor the nature of incumbency compels a challenger to make expenditures earlier than the incumbent.

Plaintiffs' contention that Carter had to travel more than Ford in order to generate media attention is simply unsupported by the record. While it is true that an incumbent President receives free press coverage by virtue of his office (Black Dep. at 41; Hart Dep. at 31), once the parties have announced their nominations, "there is no such thing anymore as a . . . nonvisible presidential candidate." (Bailey Dep. at 14; *see* Hart Dep. at 30–31. Indeed, the national mass media "bend over backwards" to provide equal coverage to the two major

party nominees (Bailey Dep. at 19–22; *see* Black Dep. at 94; Hart Dep. at 32). Plaintiffs have submitted portions of the News Digest, a compilation of summaries of network news coverage prepared by the American Enterprise Institute in 1976. (Plaintiffs' Ex. 15). This exhibit belies plaintiffs' contention that challengers are not given equal media attention and must travel to generate news coverage. A comparison between the News Digest and Plaintiff's Exhibit 2, a schedule prepared by the RNC staff from newspaper accounts which documents the whereabouts of candidate Carter from the 1976 Democratic convention until election day (Deposition of Anneadare Wood, at 4–5B), reveals that the major television networks gave substantial coverage to Carter's acts and pronouncements made while in his hometown of Plains, Georgia (Plaintiffs' Exhibit 15, at 36–39, 50–52, 55–57, 59–60, 62, 65–66, 85, 87, 91, 92, 94–95, 97–100, 110–11, 113, 115–16, 124–25, 149–50, 164–65, 216).

The court must thus conclude that the only tangible advantages of incumbency adequately proven on this record are: 1. the President's ability to use Air Force I, thereby avoiding the cost of chartering an airplane; and 2. the availability of the research and speechwriting services of the Executive Branch and White House staff (except to the extent that the challenger uses volunteers). Defendants have attempted to counter this showing with evidence of various disadvantages of incumbency: 1. the public's tendency to blame the incumbent for events beyond his control (Hart Dep. at 26); 2. the incumbent's need to exercise his power in politically counterproductive ways (Black Dep. at 100); 3. his limited time to campaign because of the responsibilities of the office (*id.*; Bailey Dep. at 16–17); and 4. the relative difficulty the incumbent has in changing his public image during the campaign because it is more "fixed" than that of the challenger. (Hart Dep. at 42; Bailey Dep. at 8–9). Although these contentions may be valid, suffice it to say that each of these political facts of life may also work to an incumbent's advantage. Thus, the public may also give undeserved credit to an incumbent for good developments that are not the result of his policies. By virtue of his office, an incumbent also has the opportunity to act in politically useful ways through patronage appointments and "porkbarrel" appropriations (Bailey Dep. at 65). While the press of governmental responsibilities may limit the incumbent's ability to campaign, the performance of public duties attracts media attention and well-known surrogate speakers may be employed to campaign on his behalf (Barbour Dep. at 59–62).

Defendants further argue that the challenged statutes, if anything, tend to mitigate the incumbent's advantage of superior fund-raising ability. Several witnesses testified that incumbents have at least a slight advantage in raising funds (Bailey Dep. at 37; Black Dep. at 99–100; Hart Dep. at 34). Plaintiffs do not dispute the following record evidence of fund raising superiority on the part of Congressional incumbents: 1. in the 1978 Congressional elections, nonparty political action committee contributions to incumbents totalled $11.6 million, while 984 challengers received $3.0 million (Defendants' Ex. V, *1977–78 FEC Report on Financial Activity # 3*); 2. in the 1976 Congressional elections, incumbents received 68% of the corporate and business-related political action committee contributions and 63% of labor and labor-related political action committee contributions (Defendants' Ex. U, *1976 FEC Disclosure Series # 9*; 3. in the 1976 House of Representatives campaigns, in which 346 incumbents ran against major party challengers, expenditures by incumbents totalled $30.7 million while expenditures by major party challengers totalled $18.1 million (*Id.*); 4. in the 1976 Senate campaigns, in which 23 incumbents ran against major party challengers, expenditures by incumbents totalled $15.2 million while expenditures by major party challengers totalled $10.3 million and incumbents outspent major party challengers in 13 of 23 races (Defendants' Ex. U, *1976 FEC Disclosure Series # 6*); and 5. in the 1978 Senate campaign, incumbents outspent major party challengers in 18 of 21 races. (Defendants' Ex. U,

*1977–78 FEC Report on Financial Activity, Interim Report, # 3.* Defendants have made no showing, however, that incumbent Presidents have had any substantial fundraising advantage over their major party challengers and, defendants' evidence with respect to Congressional races, though unrebutted, is not given substantial weight in view of the differences between presidential and local campaigns.

### D. *Advantages of Labor Organization Support Under the Statutes*

Plaintiffs allege that the statutory scheme's conditioning of federal funding upon compliance with expenditure limitations discriminates against candidates who do not enjoy substantial labor organization support. Under 2 U.S.C. § 441b(b)(2), a labor organization's communications to its members and their families "on any subject" and non-partisan registration and get-out-the-vote drives aimed at its members and their families are exempt from the statutory definition of "contribution" and "expenditure". Thus, a labor organization may engage in this activity without making a prohibited "coordinated expenditure." Although the statute grants a corporation the same rights of communication to its stockholders and executive or administrative personnel, the complaint alleges that labor organizations have a number of practical advantages in communicating with their membership on political matters, *e. g.*, the ability to impose and collect dues, geographic concentration of union membership and ready access to potential members, that render their support more valuable than that of corporations.[23]

At the outset, it must be noted that one cannot assume that labor organizations will support the Democratic presidential candidate in 1980. Although the court takes judicial notice of the fact that labor organizations have traditionally supported Democratic candidates, labor has supported Re-

publican presidential candidates in the past (Plaintiffs' Exhibit 40, at 17). While there is evidence in the record to suggest that it is highly doubtful that the AFL–CIO will support the Republican candidate in 1980 (Plaintiffs' Ex. 41), organized labor leaders have expressed great disappointment in the Carter administration and have threatened to refuse to support him if he is renominated in 1980 (Defendants' Exs. G, H).

The sole evidence submitted by plaintiffs on this claim consists of stipulations of fact between plaintiffs and the American Federation of Labor-Congress of Industrial Organizations ("AFL–CIO"), the International Union, United Automobile and Agricultural Implement Workers of America ("UAW"), and the International Association of Machinists ("IAM"), respectively. The defendants have waived any objection to the accuracy of the sampling done and the data compiled for these stipulations. The contents of these stipulations are summarized below.

The AFL–CIO is a federation of 104 unions with 13,750,000 members. The Committee on Political Education ("COPE"), a standing committee of the federation, serves as its internal political arm, and coordinates the political activities of the federation and its constituent bodies, the Trade and Industrial Departments, State Central Bodies and Local Central Bodies. Its political activities include: preparation of membership lists; registration drives among members; get-out-the-vote drives among members and endorsing candidates and notifying members of the endorsements. In addition, COPE carries out a matching grant program, by which it subsidizes permitted political activities by State and Local Central Bodies. In 1976, the estimated expenditures for the various forms of COPE activity, national and state combined, were: 1. membership identification, $538,976; 2. registration, $637,210; 3. get-out-the-vote, $1,019,168; 4. presiden-

---

**23.** Once again, *see* note 20 *supra*, it is unclear whether plaintiffs' claim of discrimination is premised upon their contention that all candidates are effectively compelled to accept public funding. It may be argued that a candidate

who lacks substantial labor organization support retains the option to reject public funding and to raise and spend sufficient privately raised funds to nullify any of the alleged advantages of labor organization support.

tial endorsement and publicity, $589,494; and 5. overhead attributable to all of these activities, $193,955.

The UAW has a total membership of 1,581,904 in the United States organized by approximately 1,500 locals. Most of its political activity in 1976 was performed by Community Action Program councils ("CAP Councils"), subordinate bodies financed by membership dues, which made political contributions and expenditures including expenditures for membership communications about candidates. The estimated aggregate expenditures in 1976 by UAW and all of its subordinate bodies for internal communications were $465,516.51 for "Carter election support" and $1,140,280.13 for "voter related activity, including voter registration and get-out-the-vote."

The IAM consists of 879,133 members organized into 1700 locals. Membership-directed political activity is generally coordinated closely with AFL–CIO State and Local Central Bodies. Although the recipients of IAM support tend to be Democrats, the emphasis is upon supporting "friends of labor". Except at the international level, the IAM's constituent bodies focus attention more upon state and local candidates than upon Presidential campaigns. In 1976, the IAM officials and staff supported Carter, but many are unhappy with his performance and may not support him should he run as the Democratic nominee in 1980. The estimated aggregate expenditures by all constituent units of IAM in 1976 were $151,358.44 for "Carter election support" and $199,541.84 for "voter registration and get-out-the-vote."

Plaintiffs have shown that major labor organizations communicate with their membership with respect to presidential elections and other political matters, but they have offered insufficient evidence from which it could be concluded (1) that presidential candidates with substantial support from labor organizations enjoy advantages over their opponents, (2) that the Republican party itself might not gain labor support, (3) that the Republican nominee would have strong corporate support, or (4) that a Republican presidential candidate who opted for private financing would not face the same alleged disadvantage, unaffected by the statutes here under attack.

Assuming that a major non-Republican presidential candidate gained some advantage from labor support, there is no evidence that the advantage would not be counterbalanced by major corporate support for his Republican adversary, as permitted by 2 U.S.C. § 441b(b)(2). Plaintiffs have offered no evidence indicating that in 1976 corporations of comparable size and influence to the AFL–CIO, IAM and UAW failed to communicate with their stockholders or administrative personnel in a manner similar to these labor organizations or that corporate political communication favoring a Republican candidate was less effective than that of labor organizations favoring a non-Republican candidate. The potential for corporate political communication with shareholders is vast: some of the largest American corporations (e. g., AT&T, General Motors, Exxon, IBM, General Electric, General Telephone and Electronics, Gulf Oil and Texaco) have more shareholders of record than employees (Defendant's Ex. I). The record fails to show that presidential candidates supported by labor organizations enjoy substantial advantage over opposing presidential candidates.[24]

24. Both plaintiffs and defendants make much of the role of corporate political action committees in Congressional campaigns. The court fails to see how the contributions record of these groups in privately financed Congressional campaigns has such bearing upon an inquiry into the power of labor organizations (and corporations) to make expenditures and contributions in a publicly financed Presidential campaign.

The evidence shows that, while many of the wealthiest political action committees affiliated with large corporations or trade associations made over two-thirds of their Congressional campaign contributions to Republicans in 1977–78, 55.2% of all expenditures by corporate political action committees were made to Democratic candidates. (Defendants' Ex. V, *1977-78 FEC Report on Financial Activity No. 2*, Vol. III). This statistic may simply reflect the fact that the Democratic Party presently

Based upon these joint findings of fact, the single-judge court, in a separate opinion, will certify constitutional questions to the United States Court of Appeals for the Second Circuit, sitting *en banc*, pursuant to 2 U.S.C. § 437h(a), and the three-judge court, also in a separate opinion, will decide the questions raised regarding the implementation and construction of the Fund Act pursuant to 26 U.S.C. § 9012(b).

So Ordered.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x

REPUBLICAN NATIONAL COMMITTEE, et al., :

               Plaintiffs, :

     – against – :

FEDERAL ELECTION COMMISSION, :

          Defendants. :

- - - - - - - - - - - - - - - - - - - -x

78 Civ. 2783

CERTIFICATION OF
CONSTITUTIONAL
QUESTIONS

Certification to the United States Court of Appeals for the Second Circuit of Questions of Constitutionality of the Federal Election Campaign Act of 1971, as Amended, 2 U.S.C. § 431 *et seq.* Raised by Defendants' Motion to Dismiss.

GAGLIARDI, District Judge.

This court, functioning as the single-judge court pursuant to 2 U.S.C. § 437h(a), and the three-judge court convened in this matter pursuant to Subtitle H, 26 U.S.C. § 9011(b), issued today, in a separate opinion, their joint findings of fact pursuant to Rule 52(a), Fed.R.Civ.P. In accordance with these joint findings, this court, once again functioning as a single-judge court, determines that the following constitutional questions are fairly presented by the record and certifies these questions to the United States Court of Appeals for the Second Circuit, sitting *en banc*, pursuant to 2 U.S.C. § 437h:

> Does 2 U.S.C. § 441a(b)(1)(B) violate the rights of one or more of the plaintiffs under the First, Fifth or Ninth Amendment to the Constitution—
>
> (a) by preventing a major party presidential candidate who accepts public financing for his general election campaign from making campaign expenditures in excess of the limits set forth therein;
>
> (b) by preventing a major party presidential candidate who accepts public financing for his general election campaign from accepting, and preventing other persons from giving, campaign contributions (including expenditures coordinated with the candidates' campaign) to that campaign;
>
> (c) by discriminating invidiously against major party presidential candidates who are challenging incumbents;
>
> (d) by being overbroad?

So Ordered.

has a majority in both Houses of Congress and that the political action committees have tended to contribute more heavily to incumbents, particularly if they hold chairmanships of important Congressional committees.